**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Zeely Rush, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhardt, | ) | Case No. 1:04-cv-054 |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Zeely Rush, seeks judicial review of the Social Security Commissioner's denial of her application for Childhood Disability Benefits ("CDB") under Section 202(d)(1) of Title II of the Social Security Act, 42 U.S.C. § 402(d)(1), and Supplemental Security Income ("SSI") under Sections 1602 and 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. § 1381(a). Chief Judge Daniel L. Hovland has referred this matter to the undersigned for preliminary consideration.

## I. BACKGROUND

### A. Procedural History

Rush initially filed an application for CDB benefits on December 30, 1999. This claim was denied by the Social Security Administration ("SSA") on March 17, 2000, and was not administratively appealed.

Rush then filed her current application for CDB and SSI benefits on April 29, 2002. (Tr. 15). Her current application was denied and she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 8, 2003, in Bismarck, North Dakota. Following the hearing, the

1

ALJ issued a decision on October 27, 2003, finding Rush was not disabled as defined by the Social Security Act and not entitled to CDB and SSI benefits. (Tr. 15-30).

Rush administratively appealed the ALJ's decision on October 27, 2003. (Tr. 6) As part of her appeal, she submitted a detailed rebuttal to the decision and offered additional supporting evidence, some of which appears not to have been considered by the ALJ. (Tr. 183-203) The Appeals Council made Rush's rebuttal evidence part of the agency record (Tr. 9), but denied her appeal on February 19, 2005. (Tr. 6). Thereafter, Rush sought judicial review of the Commissioner's decision from this court on April 22, 2005. See 42 U.S.C. § 405(g).

**B.    Background evidence**

Rush was born on June 6, 1984. She was 38 days from her 18th birthday when she filed her current claim for social security benefits and she was 19 years old when the Commissioner issued his final decision. (Tr. 15, 16, 30). Rush claims she is disabled based upon a combination of the following problems: chronic pain syndrome/fibromyalgia; morbid obesity; migraine headaches; mild anemia; elevated sedimentation rate, gastroesophageal disease; and a sleep disorder. (Tr. 65, 223)

At the time of the hearing before the ALJ in April 2003, Rush was living with her mother in a two-story house in a small North Dakota community located approximately 80 miles northwest of Bismarck, North Dakota. Rush's mother, who was a social worker, was exposed to a chemical agent in 1999 and is on disability suffering from congestive cardiomyopathy. Both Rush and her mother on are on public medical-assistance; they do not have a car and neither of them drive. Rush was the subject of sexual abuse at young age by her father. She is the product of bi-racial, African American and Caucasian marriage. (115, 119, 190, 191, 229)

2

In 1996, Rush began experiencing some pain in her abdominal area and other health issues. At that point, these were not debilitating. In the fall of 1998, when Rush was in the 9th grade, Rush began experiencing chronic pain in her chest area that gradually spread out and became progressively worse, including vomiting. She attended school on the days that she felt better during the first semester of the 1998-1999 school year. During the second semester her attendance dropped off substantially. She managed to complete the 9th grade, but there is some reference in the record to the fact that she missed approximately 50 days of school. She returned to school for her sophomore year in the fall of 1999, initially for half days, but soon quit attending because she felt she could not tolerate even part days. She completed some of her 10th grade class work over the internet, but eventually abandoned regular schooling and was working to compete her GED at home at the time of the hearing in April 2003 under the guidance of school district officials. (Tr. 21, 188, 224-225, 236, 239)

Prior to getting sick, Rush stated she liked school, was a good student, and was active in basketball, volleyball, and band. (Tr. 88, 115, 187, 236, 239) But, by the time of the hearing in 2003, she was mostly housebound because of chronic pain and fatigue. Occasionally, she would venture out for short periods with friends or her mother when she felt up to it, or for doctor visits, which she found very exhausting, especially when having to travel to Bismarck. Rush's mother recounted one occasion when Rush wanted to ride with her friends to Bismarck, but they ended up turning around and coming home because Rush couldn't take it. (Tr. 190-191, 235, 238-239) Further, even when at home, Rush and her mother stated that Rush was not able to perform many of the household chores and was limited to fixing some of the meals and cleaning her own room, which she would do at slow pace. (Tr. 79-80, 234-235) At the hearing, Rush testified she thought

she could walk a couple of blocks on her good days without stopping, but only a block on her bad days. (Tr. 229)

Rush started seeing Dr. Jan Riemers, a local general-practice physician in Hazen, sometime in 1998 or 1999, after Riemers had treated her in the emergency room for her pain. (Tr. 185) As discussed in more detail later herein, the ALJ places great reliance upon a number of the medical records from the 1999 time frame, including those of Dr. Riemers, to draw the conclusion that Rush has not been compliant in following through with recommended treatment and to call into question the veracity of the testimony of her and her mother with respect to the degree of pain Rush suffers and the impact of it upon her functional capacity. In fact, the ALJ "bolds up" and underlines certain parts of this 1999 medical evidence in the "rationale" portion of his decision. (Tr. 24-25)

Unfortunately, most of the records upon which the ALJ relies from the 1999 time frame are not part of the record that has been furnished to the court. Further, the portions of the medical evidence that are in the record from the 1999 time frame were supplied by Rush to the Appeals Council following the ALJ's decision and call into question a number of the specific findings made by the ALJ. Also, it cannot be determined at this point how much of the evidence supplied to the Appeals Council the ALJ actually saw, much less what weight he may have accorded to it. The same is true for the state agency DDS physician who conducted a paper assessment with respect to Rush's physical residual functional capacity ("RFC").

It appears from the references in the ALJ's decision to Dr. Riemers' records (which again are not part of the record) that Dr. Riemers' principal diagnosis was that Rush was suffering from fibromyalgia, but that she also believed depression and Rush's weight were significant issues during the time period she was seeing her. (Tr. 20-21)

4

The extent to which Rush's weight was a concern when she first started seeing Dr. Riemers cannot be determined because of the lack of records.   However, there is some evidence that Rush's obesity problems began when she first started having chronic pain (Tr. 116), worsened during the time she was seeing Dr. Riemers, and continued to get worse thereafter.   During the hearing, Rush testified that a couple of years previous she thought her weight was around 250 lbs.  (Tr. 221)  If her weight was that low, it probably was in the 1998 time period and either before or when she first started seeing Dr. Riemers.   This is because the ALJ in his decision indicates that her weight was 308 lbs. in April 1999, although this cannot be confirmed from the record.  (Tr. 20)

By May 2000, however, and after Rush had stopped seeing Dr. Riemers, her weight had climbed to 339 lbs. based on a historical note in a later-dated record.   And, on April 3, 2001, an attempt was made at a Bismarck clinic to weigh Rush and her weight at that time was recorded as being in excess of 350 lbs. along with a note that a more accurate measurement was not possible because the clinic's scales did not go higher than 350 lbs.  (Tr. 128)  Later, while at the Mayo Clinic, more definitive measurements were made of Rush's height and weight, along with her body mass index.   In June 2001, the Mayo Clinic described Rush as being "massively obese" (Tr. 119) and recorded her weight at 361.56 lbs, her height at 69.2 inches (just under 5' 10"), and her body mass index at 52.944 KB/M2. (Tr. 111, 113)  As discussed in more detail below, this put Rush at the higher end of the "extremely obese" category - much greater than the 95th percentile.  (117)  Finally, as noted below, there are additional records that indicate that Rush's weight increased even more after her evaluation at Mayo with the last recorded weight being 363 lbs.[1]

---

[1]  At the time of the hearing, Rush testified she was 350 lbs.  It is not clear, however, whether this was based on a recent measurement or was a guess.  This point is noted because at several points in the record Rush tended to minimize her actual weight.

In any event, it appears that Dr. Riemers referred Rush to physical therapy during 1999. As discussed in more detail below, the ALJ places significant emphasis on statements made in the initial physical therapy records that Rush showed signs of improvement initially and suggests from that she was not compliant. (Tr. 21, 25) However, the physical therapy records are also not part of the record. Further, there appears to be later physical therapy records that may be inconsistent with the inferences drawn by the ALJ from the early records and it cannot be determined now whether the ALJ had all of the records. (Tr. 198-199)

During the summer of 1999, Dr. Riemers also referred Rush to at least two specialists. In his decision, the ALJ references an evaluation made on June 12, 1999, by an unnamed pediatric physiatrist (most likely Dr. Dilla) for Rush's chronic pain. (Tr. 20) The ALJ again placed significant weight upon the records of this examination in the "rationale" portion of his decision when he noted that the doctor ordered physical therapy, recommended minimization of absences from school, and reactivation of a more active and social lifestyle, but that there was no indication that claimant pursued this recommendation. (Tr. 25) However, again, the report of this physiatrist is not part of the record. Further, as discussed later herein, several of the inferences drawn from the report are questionable in light of the evidence of Rush's later unsuccessful physical therapy attempts (Tr. 198-199) and the fact that Rush did attempt to return to school in the fall of 1999 in accordance with the recommendations that she do so, but soon stopped going because she felt she could not tolerate the activity. (Tr. 21, 224-225, 236, 239)

Dr. Riemers also believed that Rush was suffering from "out-of-control" depression - at least according to the ALJ's decision. It appears that Rush and her mother did not agree and were indicating that chronic pain and fatigue were the biggest problems. In any event, Dr. Riemers

6

referred Rush to Dr. David Brooks, a clinical neuropsychologist, for a psychological and chronic pain management assessment. (Tr. 180)

The record before the court does contain Dr. Brooks' report, but only because it was supplied to the Appeals Council by the claimant and it is not clear whether the ALJ had this report available to him as part of the 1999 medical records when he made his decision. (Tr. 204-207) The ALJ does make reference to the referral, but does not detail the findings and conclusions (as he did for the unnamed physiatrist who saw Rush during the same time period) and the fact of the referral might have been gleaned by the ALJ from Dr. Riemers' records. (Tr. 20)

Dr. Brooks saw Rush on June 24, 1999. At that time, he conducted a clinical interview, administered an MMPI, and had Rush complete a pain assessment battery. He concluded, (1) that Rush's pain and headaches fluctuated from very little on some days to "extremely high" on others, (2) that Rush's complaints of pain and severe headaches (to the point of causing nausea at times) were credible in that Rush was "not magnifying her symptomatology" and that she "often experiences quite significant chronic pain," (3) that Rush was not depressed, and (4) that there were indications that Rush was coping reasonably well under the circumstances, in spite of appearing to others as coping poorly. (Tr. 204-207)

Dr. Brooks recommended that (1) Rush attempt to attend school on the days that she felt better or could tolerate the pain (but also concluded that it was not unreasonable that she not attend or that she come home early when the pain was not tolerable), (2) that she attempt some physical conditioning under the supervision of the doctor to see how much she could tolerate, and (3) that she be referred to a neurologist for further exploration of the headaches and a physical medicine physician for addressing the pain management. With regard to possible physical medicine

7

physicians, Dr. Brooks made several recommendations. One of the persons he recommended was was Dr. Martire, who, as discussed below, Rush ultimately consulted and continued to see at least until January 2003. (Tr. 204-207)

In her rebuttal to the ALJ filed with the Appeals Council, Rush complains about the fact that the ALJ ignored Dr. Brooks' report. She also claims that Dr. Riemers was upset by the conclusion reached by Dr. Brooks that Rush was not severely depressed. It appears that conflict with Dr. Riemers led Rush's mother to seek a change with respect to Rush's primary-care physician, which apparently had to be approved by public assistance. (Tr. 185)

Rush then started seeing Dr. Denise McDonough of Medcenter One Family Medical Center South in Bismarck. Dr. McDonough's initial records have also not been included as part of the court's record. The first records that are included begin in January 2001, but these records reference earlier visits. From the records that are available, it appears that Dr. McDonough's diagnosis was that Rush was suffering from chronic pain, compounded by her weight, and that her working diagnosis for the etiology of the pain was fibromyalgia. (Tr. 130-136, 201)

After Rush started seeing Dr. McDonough her condition did not improve. Dr. McDonough stated in her January 4, 2001, chart that Rush was still having "a lot of problems with pain." She also noted that Rush was not using a whole lot of medicine for pain, but stated "[s]he is really intolerant to most of the medications." She then added that Rush and her mother had been reluctant to follow through with a number of the recommendations from the specialists that she had referred them to. The ALJ emphasized this point in his decision as an example of Rush's non-compliance. (Tr. 25, 135-136)

The records of these other specialists (*i.e.,* referrals prior to January 1, 2001, by Dr. McDonough) are not part of the record, however, so it is not possible to evaluate this somewhat cryptic comment. The only information with respect to these referrals is a historical note in a later record which indicates (1) that one of the doctors to whom Rush was referred in 2000 was Dr. Lynne Peterson, who diagnosed Rush as having chronic pain syndrome, fibromyalgia, depression, an elevated sedimentation rate, and possible sinusitis, and (2) that a further referral was made to another psychiatrist (Dr. Goodman) that resulted in a diagnosis that Rush did not have severe depression consistent with the earlier determination made by Dr Brooks. (Tr. 128)

When the ALJ pointed to the somewhat ambiguous reference in Dr. McDonough's records about Rush and her mother not wanting to follow through with other referred specialists, the ALJ neglects to mention with respect to this time frame (and which seems contrary to the inference of non-compliance) is that Rush's mother wanted Rush sent to the Mayo Clinic because she was concerned there was something else going on that was causing Rush's problems that the local doctors had not been able to diagnose. Also, the referral to the second psychiatrist resulted in the same diagnosis that Dr. Brooks had made and to Rush and her mother seemed unnecessary. (Tr. 129, 135, 190)

By January 2001, Dr. McDonough was willing to refer Rush to the Mayo Clinic. However, before public assistance would pay for an examination at the Mayo Clinic, Rush was required to get a second opinion that a referral to Mayo was necessary. (Tr. 136) She was then referred back to Dr. Peterson for this evaluation, which took place on April 3, 2001. In her patient history, Dr. Peterson noted that Rush had dropped out of school since the last time she saw her and that she was currently taking classes over the internet because staying in class was too hard because of her pain

and poor concentration. She also notes that Rush continued to have sleeping problems and had migraine headaches.

During her physical examination of Rush, Dr. Peterson observed that Rush had multiple tender points, but that her joints were without synovitis, her lungs were clear, and she had no lymphadenopathy. She described Rush's affect as flat. Ultimately, she concluded that Rush was still suffering from chronic pain syndrome/fibromyalgia, some depression, and that she continued to have an elevated sedimentation rate of an unclear etiology and agreed with a referral to the Mayo Clinic. During that visit, Rush and her mother asked about whether prescribing a narcotic for the pain would be appropriate. Dr. Peterson, however, was reluctant to do so given Rush's age. As discussed later herein, the request for more effective pain medication seems consistent with Rush's complaints of continued chronic pain. (Tr. 128-129)

Rush visited the Mayo Clinic in June of 2001 for tests and a diagnosis. At that time, she met with several different specialists. (Tr. 105, 109, 111, 114, and 116) She first met with Dr. Stephanie Starr, who examined Rush on June 19, 2001, and then arranged for the other consultations. The physical examination showed Rush weighed 361.34 pounds, which gave her a body max index (BMI) of 52.6 kg/m2 and placed her in much greater than the 95th percentile in terms of obesity. The report of the examination noted that Rush was generally an alert and interactive young girl that was pleasant and who smiled and laughed frequently and was not in any acute distress. The report indicated that Rush described some discomfort in the midline, lower thoracic, and mid lumbar back. The report further stated that Rush had some "decreased range-of-motion when asked to put her right ear to her shoulder but was able to improve the range-of-motion after 'popping' her neck," and she had no swollen joints. (Tr. 116-117)

10

In Dr. Starr's impressions and plan, she stated she was concerned about Rush's gastroesophageal reflux disease. In regard to the complaints of chronic back and musculoskeletal chest pain, she noted that Rush had a history of a normal bone scan and that she should be tested further for chronic pain and possible fibromyalgia. Dr. Starr concluded physical exercise would play a key role in any recovery because of Rush's obesity. (Tr. 117-118)

Rush next visited Dr. Jean Perrault with regard to the possibility of gastroesophageal reflux disease, and Dr. Perrault found that Rush possibly suffered from chronic reflux esophagitis and maybe even Barrett's esophagus. Further tests were ordered to evaluate this concern. (Tr. 119-20)

On June 20, 2001, Rush met with Dr. Carrie Ditmer of the Mayo Clinic for a psychological evaluation. In Dr. Ditmer's report, she stated that Rush had suffered a significant amount of functional impairment as a result of pain syndrome. The doctor strongly recommended to Rush and her mother that Rush work with their school in an effort to have Rush involved in the academic setting "as much as possible." Dr. Ditmer opined that Rush presented a "number of depressive symptoms including irritability, sleep and appetite disturbance, as well as anhedonia." The doctor noted, however, that she believed these "symptoms were more an adjustment reaction rather than a true depressive disorder." Dr. Ditmer gave Rush numerous educational handouts dealing with nonpharmacological pain management strategies and encouraged follow ups with either herself, or local doctors, but then concluded that there were no local doctors available. (Tr. 114-115)

Rush next met with Dr. Thomas Mason at the Mayo Clinic for an evaluation of her complaints of chronic pain. Dr. Mason's physical examination indicated there was no evidence of pain on range of motion, no skeletal misalignment, and no reflex problems. He did note, however,

that Rush had trigger points for fibromyalgia in the intra-scapular, supra-scapular, anterior chest wall, and trochanteric bursa regions.  His ultimate diagnosis was the following:

1.  Mild anemia;
2.  Chronically elevated sedimentation rate;
3.  Non-inflammatory musculoskeletal pain, fibromyalgia;
4.  Marked obesity; and
5.  Family history of inflammatory bowel disease.

His report also discussed in some detail the elevated sedimentation rate, but he was unable to provide any real explanation for why it was elevated, noting that it could be the result of some infection process and there might be some link to her obesity.  (Tr. 111-112)

Rush met with Dr. Starr to review the evaluations of the several doctors that evaluated Rush during her week at the Mayo Clinic.  She discussed with Rush and her mother the results of the examinations and the various tests that were performed.  Dr. Starr stated that the Clinic did not find an etiology that explains Rush's chronic pain.  She said, based on Dr. Mason's evaluation, there is no evidence for inflammatory process at this time; however, it was difficult to explain her anemia and elevated sedimentation rate.   Dr. Starr recommended that Rush start a multivitamin with iron because of her anemia, along with a calcium supplement. She recommended that Rush should work on gentle reconditioning and a step-wise plan for returning to school and more physical activity. She emphasized this "may take a prolonged period of time."  (Tr. 107-108)

The last doctor Rush met with at the Mayo Clinic was Dr. David Nash to discuss conditioning and pain management.  During a physical examination, Rush also told Dr. Nash that she has some tenderness over the midline cervical and upper thoracic spine and some tenderness in the paraspinal areas as well as over the trapezius muscles, but Dr. Nash did not identify any trigger points - contrary to the finding made earlier by Dr. Mason.   He found that Rush had excellent range

12

of motion without complaints of pain.  Dr. Nash diagnosed Rush with chronic pain syndrome and

morbid obesity and recommended that Rush start a daily exercise program and resume attending

school.  (Tr. 105)

Following the evaluation at the Mayo Clinic, Rush continued to consult with her primary-

care physician, Dr. McDonough.  Although the records are not clear (and may be incomplete), it

appears that Dr. McDonough referred Rush to Dr. Pedro Mendoza, a sleep specialist with Medcenter

One in Bismarck.  Dr. Mandoza saw Rush on August 1, 2001, and concluded that most of Rush's

sleeping problems were due to sleep onset and sleep maintenance insomnia, which he believed to

be related to:

> 1) Fibromyalgia and significant pain.
> 2) Psychophysiological insomnia with the possibility of her early life experience with sexual molestation at the age of 5 years of age by her father.
> 3) Poor sleep hygiene habits in view that prior to going to bed she is either watching television or on the computer.

He also stated that there might be an upper airway obstruction during the night that was causing

some of the problems.  He suggested implementing a sleeping technique that will be adjusted over

time with a follow-up visit to look into circadian rhythm abnormalities and/or restless leg syndrome.

He also indicated that sleep apnea (a common condition in people suffering from obesity) was also

another possibility.  (Tr. 125-126)

Rush returned to Dr. McDonough on September 27, 2001.  At that time, Rush reported that

she was continuing to have significant pain.  She reported that she had attempted to follow the

recommendations of Dr. Mendoza regarding her sleep problems and insomnia and that the

recommendations had not worked.  She also reported having gone a number of days with just one

or two hours sleep and that her back pain increased during this period.  It was also noted that Rush's

weight appeared to have increased and that she now weighed 363 lbs. Dr. McDonough's continued working diagnosis was possible fibromyalgia and she referred Rush for physical therapy at the Hazen Hospital, urged her to continue with the chiropractor since this was providing some relief, prescribed some pain medication, and indicated she would refer Rush to see someone for chronic pain management since that had not been tried. (Tr. 132)

Rush again returned to Dr. McDonough on February 28, 2002, for a recheck. At that time, Rush reported continued problems with pain and that she was also having irregular periods. In the history portion of the chart, McDonough noted that she had seen Dr. Killen for chronic pain (it does not appear these records are included in the court's record) and that there had been a referral to "peds rehematology" at the University of Minnesota (although it is not clear whether there was any such visit and Dr. McDonough may have confused this with the Mayo Clinic). Dr. McDonough notes with regard to her past history that "everybody has come back saying she has chronic pain syndrome." She further discusses Rush's intolerance to a number of the medications that have been prescribed and also the fact that medications to assist with sleep have been unsuccessful and that Rush has not been sleeping very well. She further noted that Rush appears to have gained even more weight. Finally, she noted that she and others have encouraged more exercise and stretching as well as weight loss and notes that "up to this point she has not done the above," but does not discuss whether she has been physically able to and does not mention the results of the physical therapy at the Hazen Hospital, much less whether she even had those records. (Tr. 130-131)

Dr. McDonough conducted a physical examination on February 28, 2002. She observed that Rush was not in acute distress and that she did not have any redness or swelling in the joints. However, she noted she was tender in the upper and low back and that she had diffuse areas of

tenderness in the medial elbows and knees. Dr. McDonough's diagnosis continued to be fibromyalgia or chronic pain syndrome. Further, even though a request was made by Rush and her mother, she indicated that she did not want to put Rush on any narcotic medication for chronic pain. She urged water therapy and exercise. She also indicated that she would refer her to Dr. Martire, a pain specialist to address the chronic pain. (Tr. 130-131)

Rush saw Dr. Martire at the Spine & Pain Center (Spine Center), P.C., in Bismarck for the first time on March 28, 2002. In the report of his examination, Dr. Martire set forth a detailed history along with a summary of a number of the more pertinent prior evaluations. He also reviewed the prior pain medications that had been tried that either were ineffective or caused side effects. He also reviewed with Rush her physical therapy efforts. (Tr. 153-154) He also noted the following:

> Overall, the patient indicates that her chronic pain is worsening along with the associated sleep problems and fatigue. She does not have any definite numbness or tingling into her upper or lower extremities, but will experience "coldness" of her hands and feet at times. The patient and her mother also report that she is clumsy at times and will occasionally drop things. The patient and her mother are very interested in any additional diagnostic or treatment recommendations at this time.

(Tr. 154)

This is at least the second time that Rush complains about occasional coldness in her hands and extremities prior to the hearing. (Tr. 243-246) She also remarked about her hands turning blue occasionally at the Mayo Clinic. (Tr. 117) Her mother indicates this was also noted in biofeedback notes and the records of Dr. Peterson, which may also be true. As noted before, the record certified to the court does not include any of the biofeedback records and only part of Dr. Peterson's records. (Tr. 192)

The significance of this is that Rush testified to the problems with coldness in her hands and clumsiness at the hearing. Later, in his opinion, the ALJ indicated that these complaints had never

15

before been presented to an examining physician and inferred that they had been made up for the purpose of claiming disability. (Tr. 26) The ALJ was clearly wrong about the complaints having not been presented to an examining physician.

Dr. Martire conducted a physical examination of Rush during his first visit with her on March 28, 2002. While Rush did not appear to be in any acute distress and did not exhibit any obvious pain symptoms, Dr. Martire detected multiple points of palpatory tenderness that are detailed in his report. He also indicated concern over Rush's elevated sedimentation rate that he stated was not a characteristic of fibromyalgia, but was a significant finding given Rush's age. He indicated that this, coupled with generalized muscle pain and tender points, could be indicative of a muscle disorder that should be evaluated, but which also may not manifest itself until some time in the future. He recommended a number of further diagnostic studies. His overall diagnosis was the following:

    1.    Generalized myalgias
    2.    Elevated sedimentation rate of unclear etiology.
    3.    Sleep dysfunction.
    4.    Fatigue.
    5.    Thoracic pain.

(Tr.153-156)

Rush returned to the Spine Center a number of times following her initial consultation and evaluation for additional tests and to try different combinations of pain medicines. For example, the Spine Center performed a battery of Electrodiagnostic studies on Rush and the results came back normal, ruling out any neuromuscular disorder. (Tr. 147) She also had an MRI at Medcenter One on her thoracic spine, which also came back normal. (Tr. 158) Throughout her course of treatment and evaluation by Dr. Martire, his diagnoses of chronic pain possibly related to fibromyalgia,

16

insomnia, and chronic fatigue remained essentially the same and none of the drug combinations that he tried were successful. (Tr. 133-156)

The ALJ in his opinion gives as an example of alleged non-compliance by Rush with treatment recommendations the fact that the last treatment record he had for Dr. Martire was in September 2002 and that this suggested no further follow-up. (Tr. 26). However, as discussed later herein, it appears that Rush did in fact continue to see Dr. Martire on a periodic basis through January 2003 and that, after approximately fifteen separate visits, he concluded that there further consultation was not necessary because the pain medications that he had tried over this period had not worked. (Tr. 187)

As already noted, Rush was referred to the therapy department at the Hazen Hospital (also referred to as the Sakakawea Medical Center). It appears that Rush was seen there a total of fourteen times between March 1999 and December 2001. While the therapy records are not part of the court's record even though the ALJ obviously relied upon at least a portion of the 1999 records, Rush supplied to the Appeals Council with both a typed letter and a handwritten note from one of the persons involved in administering physical therapy to Rush. The handwritten note states that the ALJ had taken part of the physical therapy records "out-of-context" in his decision. The typed letter summarizes the physical therapy efforts from 1999 through 2001, and then goes on to state that Rush was not able to participate in much of the physical therapy because she was in too much pain and that she did not respond to any of the pain-reducing modalities. The author stated that this can be typical of people with fibromyalgia. (Tr. 198-199)

In addition to the medical records, the paper record before the ALJ also included several questionnaires from Rush and from family and friends that describe Rush's condition and her

17

claimed limitations. One of the questionnaire's was completed by a family friend, who was a registered nurse and who had known Rush and her family for about 13 years. The responses she gave to the questions supported Rush's claims of physical disability, including her chronic pain, fatigue, her inability to go to school and to otherwise function normally. (Tr. 82-85) No mention of this was made by the ALJ in his decision.

On June 26, 2002, a Physical Residual Functional Capacity Assessment (Physical RFC Assessment) was performed by a state medical consultant. The state agency physician concluded that Rush could (1) occasionally lift and/or carry twenty (20) pounds and frequently lift and/or carry ten (10) pounds, (2) could stand and/or walk with normal breaks for at least two hours in an eight hour workday, (3) sit with normal breaks about six hours in an eight hour workday, and (4) push and/or pull without limitation, except for the lift and carry exceptions. The reviewing physician concluded that Rush does have fibromyalgia with trigger points, but that her allegations of pain, limitation on range of movement, and not being able to do much were only partially credible. He concluded, that Rush's condition was compromised by her obesity and lack of ambition and that her condition "did not compromise her ability to perform her ADL's." (Tr. 166)

The Physical RFC Assessment, however, was only a paper, checklist review based on medical records. The examiner did not personally examine Rush nor did he refer her for actual physical testing of exertion capacity. In fact, none of the medical records before the court indicate that any actual physical testing of Rush's capacity for exertion has ever been done. Finally, as discussed later herein, it cannot be determined what records were submitted to the state reviewer who conducted the paper Physical RFC Assessment, and, given the problems of the incomplete

18

record before the court, there is a concern that the reviewer may not have had all of the pertinent records. (Tr. 161-68)

Rush also had a paper psychiatric review by a State medical consultant.  The medical consultant found that Rush's mental impairments were not severe, but that she had coexisting nonmental impairments and affective disorder.  The affective disorder was related to the chronic pain.  The only functional limitation from a psychiatric standpoint that the medical consultant found was a mild limitation in maintaining concentration, persistence, or pace.  (Tr. 169-179)

### B.    Hearing before the ALJ

The hearing before the ALJ was held on April 8, 2003.  Rush appeared in person along with her mother, Cheryl Rush, but was not represented by counsel. (Tr. 218)  Also appearing at the hearing was Dr. David Perry, a vocational expert.  Id.

The ALJ informed Rush the hearing was to determine whether or not she has a condition, or combination of conditions that prevents her from doing her past relevant work, or the work in the national economy.  (Tr. 219). The ALJ told Rush she had the right to be represented at the hearing. He stated:

> There should have been information sent to you about your right to be represented. There are - - it's my duty to make sure that you understand, fully understand your rights along that line.  There are agencies that represent people here free of charge, if you qualify for their services.  There are attorneys' there are non-attorneys that appear here regularly representing people who charge only if you're successful in pursuing the claim. It's not mandatory that you be represented, it is a right that you have.  If you would like to seek representation we will continue the hearing one time, to give you that opportunity.  As I stated, it's not mandatory that you be represented, you may proceed on your own today if you wish.  But of course you would be waiving your right to be represented for purposes of this hearing.  What's your wish?

> [Rush]: I wish to continue today.

(Tr. 219). The ALJ told her that because she was claiming benefits as a child and an adult, they needed to address disabilities relating to both age groups. (Tr. 220). He then asked her again, "Now knowing that, do you still want to be on your own today? Id. She responded, "Yeah, yes." Id.

Rush testified generally about a combination of medical conditions that she claims prevented her from completing high school and that now prevents her from working, including chronic pain syndrome/fibromyalgia, morbid obesity, chronic fatigue, migraine headaches, mild anemia, an elevated sedimentation rate, acid reflux, and sleep disorder. She testified she can walk a couple of blocks without stopping on her good days and maybe a block when she is having pain. (Tr. 229). She opined that sitting was "uncomfortable" if she did it for a long period of time. (Tr. 231). Her mother testified that her limitations have completely changed her life and that no medications have helped her cope with the pain. (Tr. 236-38). They both testified, essentially, that she was not capable of working.

Vocational expert Dr. David Perry testified about the Dictionary of Occupational Titles and the requirements of the jobs listed therein. The ALJ told Dr. Perry there was no work history for Rush and then asked him:

> So hypothetically, assume an 18-year old, with a tenth grade education, that can sit for six hours in an eight-hour day. Stand and walk in combination for two. Lift five to ten pounds occasionally. Now what level are we at?

Dr. Perry answered that it was a sedentary level. The ALJ then asked, "So that person would be able to [do] sedentary, but what skill level would you be looking at for that hypothetical person?" Dr. Perry opined that a person who has never worked before and had not completed high school would be limited to unskilled work. (Tr. 242)

The ALJ further asked Dr. Perry if "moderate concentration limitation due to pain" was added to the scenario, whether that would change anything. Dr. Perry responded that would eliminate some jobs, but that there are still some unskilled jobs that do not require significant concentration. Id. The ALJ asked Dr. Perry if he had examples of that work, including the concentration limitation, the hypothetical person could do. Dr. Perry stated:

> A couple of examples would be that of a telephone quotation clerk. Another example would be that of a toy stuffer, a person who actually puts the insides into stuffed toys. Another example is that of a dial marker, this is somebody that works on electronic equipment, but basically marking dials. These positions in this region, there are 2,800 jobs in putting toys together, this toy stuffer position. There are 470 jobs for the dial markers.

(Tr. 243)

The ALJ then asked whether for this type of unskilled work that the employee would have to work at the hours set by the employer. Dr. Perry then responded:

> That's correct. You need to be there pretty much on a full-time basis, eight hours per day, for five days a week. The schedules are generally set by the employer and there's not a lot of flexibility to those schedules.

(Tr. 243) He then testified that normal breaks would be 15 minutes breaks in the morning and afternoon. The ALJ then asked what the absence tolerance would be and Dr. Perry responded that on an average it would be two days per month for unskilled work and that person who could not meet that restriction generally speaking "would not be competitively employed." (Tr. 243-244).

After the above testimony was elicited from Dr. Perry, Rush told the ALJ and Dr. Perry that she had pain in her hands when doing repetitive work, that she was clumsy, and that she could not sit for periods of six to eight hours a day. Specifically, she stated that she could not write more than a page without her hands starting to hurt. Dr. Perry then stated that a lot of the unskilled work required repetitive use of the hands. (Tr. 245)

21

In addition to the witness testimony, the ALJ also received a number of exhibits at the hearing. Unfortunately, the exhibits were not separately identified and are simply referred to in the transcript as being the exhibits in the exhibit file. (Tr. 220) This is significant because, as discussed below, the ALJ in his decision relies heavily upon a number of medical and other records from the time period prior to the SSA's denial of Rush's first claim on March 17, 2000, that are not part of the record presented to this court and that may also not have been part of the records received at the hearing.

### C.    ALJ's decision denying benefits

The ALJ concluded that Rush suffered from chronic pain syndrome related to fibromyalgia aggravated by morbid obesity. While he found these conditions to be "severe" within the meaning of SSA's regulations, he concluded that the impairments did not meet or medically equal one of the listed impairments that amount to a *per se* qualifying disability. (Tr. 29) Consequently, since Rush had no past relevant work history, he proceeded with familiar step five analysis of determining whether there are jobs in the national economy that Rush could perform in terms of Rush's eligibility for adult SSI benefits.

Although confronted with evidence that Rush was unable to complete high school allegedly because of her chronic pain and fatigue, that she weighed 350 pounds, or more, and was near the high end of the highest category of obesity (*i.e.*, "extreme obesity"), that she had been mostly housebound for several years, that she never worked (or even learned how to drive a car), the ALJ determined that Rush was capable of performing a significant range of sedentary work that exists in significant numbers in the national economy. (Tr. 29-30) The ALJ reached this conclusion by

making a determination regarding Rush's RFC and then posing questions to a vocational expert based on his RFC determination.

More specifically, the ALJ concluded that Rush was capable of lifting five pounds frequently and ten pounds occasionally; sitting for up to six hours in an eight-hour shift with normal breaks; standing/walking up to 2 hours in a workday with normal breaks; and performing work that does not involve high levels of concentration. (Tr. 29) He also implicitly concluded, based upon the limitations imposed by the vocational expert which he apparently accepted, that Rush was capable of doing this work on a day-in-and-day-out basis with an allowance of only two absences per month.

In making his RFC determination, the ALJ relied primarily upon the paper Physical RFC Assessment made by the state DDS physician because there is no evidence of actual testing of Rush's physical capabilities and exertion levels and no evidence of an opinion by any other medical professional that Rush is capable of working on a daily basis at the pace and persistence required of the jobs the ALJ concluded she could perform. Further, in discounting the testimony of Rush and her mother that Rush's condition does not permit her to work on any sustained basis, the ALJ (in the "rationale" portion of his decision) listed fourteen "bullet-point" items of evidence (in most cases merely inferences from the evidence) that he concluded suggested a "theme of non-compliance with treatment recommendations for unknown or unclear reasons." A number of the treatment recommendations had to do with Rush not carrying through with recommendations that she lose weight and engage in more physical activity. (Tr. 24-28)

In addition, the ALJ further concluded that several of the limitations claimed by Rush and her mother in terms of Rush's clumsiness, lack of dexterity, and problems with her hands were offered solely for the purpose of avoiding a finding of non-disability and were not credible. Finally,

he accused Rush's mother of enabling Rush's condition and possibly sabotaging her recovery, including stating at one point the following:

> This is a young girl who needs to get out in the community and interact and socialize with others of her own age. Instead her mother has allowed her to quit school and primarily stay in her room or at home and focus on her pain and be inactive, thus increasing her weight which in turn could reasonably be expected to impact on her pain and immobility.

(Tr. 26)

The ALJ concluded overall that Rush was not entitled to adult SSI benefits. He disposed of the claim for childhood benefits in one sentence by stating that he was adopting the findings of the State Agency medical consultants that the evidence showed no limitation in cognitive/communicative functioning; social functioning; personal attainment, or concentration persistence, or pace; or that her motor functions for her age were less than indicated. (Tr. 28)

### D.    The appeal to the Appeals Council and additional submitted evidence

Following the ALJ's decision denying benefits, Rush appealed the decision to the Appeals Council. As part of the appeal, Rush and her mother submitted a fifteen-page, single-spaced statement that point-by-point challenges the ALJ's decision. (Tr. 184-197) This joint statement was accompanied by other documents and records supporting a number of the points made in rebuttal to the ALJ. (Tr. 198-215)

 The following is summary of the more salient points made by Rush and her mother in their joint statement to the Appeals Council, some of which have already been discussed:

- •    They vociferously object to what they considered was the ALJ's implicit conclusion that they had made up and orchestrated Rush's illness just to obtain disability benefits. Likewise, they also strongly object to the ALJ's statement that Rush's

mother had fostered and enabled Rush's condition and interfered with her successful treatment. With respect to both claims, they give a detailed explanation for why the ALJ was wrong. (Tr. 198-215)

• They discuss in detail why the ALJ was wrong when he concluded there were indications Rush had not been compliant with treatment recommendations. While the entire rebuttal should be consulted, the following summarizes the more pertinent points made in response to specific points raised by the ALJ:

   • physical therapy - In response to the ALJ's reliance upon portions of 1999 physical therapy records as evidence of non-compliance with recommended treatment, they state Rush did follow through in attending physical therapy, not only in 1999, but also in the years 2000 and 2001. They state she simply was not able to tolerate much of the therapy because of her chronic pain and back this up with a letter and handwritten note from the physical therapist that has already been mentioned and that is discussed in more detail below. (Tr. 192-193)

   • exercise and stretching - In response to the suggestion that Rush has not followed through with recommendations for exercise and stretching, they say that Rush has done this primarily at home (other than the physical and hydrotherapy that she has attended), but she has been limited in what she can do by her chronic pain and fatigue. (Tr. 193)

   • school attendance - In response to the ALJ's charge that Rush's mother enabled her condition by allowing her to stay at home and that they had not

25

been compliant with recommendations in the spring and summer of 1999 that she attempt to return to school, they state that Rush's mother made Rush go to school on many days, even when she was not feeling well, because that was what Dr. Riemers had recommended and that Rush did return to school in the fall of 1999, but, after making the attempt, simply could not handle it. They also stress that Rush has not given up on schooling in that, at the time of the submission of their joint statement, Rush was working with local school officials to complete her GED and that she had applied for vocational rehabilitation and has been accepted.  (Tr. 185-186)

- hydrotherapy - They state Rush followed through in attending hydrotherapy sessions in Bismarck, but this was difficult because of the distance and transportation problems and that, after trying it for several months, any benefits were outweighed by the negative impact on her condition caused by the travel.  (Tr. 189)

- chiropractic treatment - They state Rush, in fact, went regularly for chiropractic treatment for two years and that  the acupuncture was beneficial in reducing her migraine headaches to the point where it is no longer as significant an issue.  They further state that, when the migraines became less frequent, she quit going to the chiropractor because the continued treatments were not giving her any significant relief for her chronic body pain. (Tr. 188)

- biofeedback - They say the ALJ took statements from the bio-feedback records out-of-context and failed to note other statements in the records

26

indicating the sessions were not providing any significant pain relief and that she should be discharged from the sessions. (Tr. 191-192)

- <u>in-patient pain program recommended by Dr. Riemers</u> - In response to the ALJ's statement that they had not complied with Dr. Riemers' recommendation that Rush enroll in an in-patient pain treatment program, they state Dr. Riemers recommended two programs, one they could not afford, and that public assistance would not pay for, and one Rush was not eligible for because of her age. They state Dr. Riemers later confirmed these facts. They also emphasize that Rush did, in fact, follow through on other referrals made by Dr. Riemers and that they also independently sought other assistance. (Tr. 189)

- <u>use of the drug Stadol</u> - The ALJ refers to a note in a medical record that Rush obtained some pain relief from the drug Stadol and then claimed that she testified untruthfully at the hearing when she stated that she did not get any significant pain relief from the drugs that had been prescribed. Rush and her mother state the ALJ failed to recognize that Stadol is classified as an opiate and addicting drug and that the doctors would not prescribe this routinely for Rush because of her young age and the concern she might become addicted. The point they make is that Rush's answer was in response to what the doctors were willing to routinely prescribe. (Tr. 188)

- <u>sleep issues</u> - They state that Rush attempted to comply with recommendations regarding sleep habits, but without any real success. They

27

state that isolated references in the records to TV watching and computer use were taken out-of-context in terms of the efforts that were made with respect to compliance. They also state that the ALJ focused on a mention of caffeine in one of the medical records, but he did not ask them about this so he was not aware that Rush had stopped drinking pop with caffeine for more than a year with no change in her symptoms. (Tr. 193)

- medical consultations after September 2002 - In response to the ALJ's conclusion that there was no follow up with Dr. Martire because the last record he had was in September 2002, they state that, in fact, Rush continued to see Dr. Martire through January 2003 for a total of appoximately15 separate visits from March 2002 through January 2003. They further state that Dr. Martire finally concluded that there was nothing more he could do for her in terms of finding a combination of drugs that would deal with her chronic pain. (Tr. 187)

- Also, in response to the suggestion by the ALJ that there was non-compliance with treatment recommendations, Rush and her mother more generally emphasize all the efforts they have made to find a solution to Rush's chronic pain and fatigue, including seeking second opinions in Bismarck and then to the Mayo Clinic and the fact that they had to make many trips to Bismarck (80 miles distant), and elsewhere, to see numerous doctors, which has been difficult and time-consuming given that they do not drive and have to depend upon public transportation from Hazen that only runs a couple of times a week. (Tr. 190-191)

- They discuss in more detail the background of how Rush got sick and the fact that her chronic pain (which began to get significantly worse during her freshman year of high school) preceded her significant weight gain. (Tr. 193-194) They also discuss in more detail that, prior to getting sick, Rush was regular in her school attendance and very active physically, including swimming, riding bike, playing T-ball, and playing both volleyball and basketball in school and in summer leagues. However, after she got sick, she could no longer handle this physical activity. (Tr. 186-187, 193-194)

- They discuss the fact that none of the doctors have been able to find an answer as to why Rush's sedimentation rate remains elevated and the fact that the doctors have been concerned about this and believe it may relate somehow to her current sickness. (Tr. 190, 195-196)

- They again emphasize the reasons why Rush is not able to tolerate the physical activity required to work at the level the ALJ concluded she could work. (Tr. 195-196)

In addition to their detailed statement, Rush and her mother also submitted several other items of evidence as follows:

- The letter and handwritten note from one of the persons who was involved in Rush's physical therapy, which has already been discussed. (Tr. 198-199).

- A "To Whom it May Concern" letter from Dr. McDonough, Rush's current primary physician, dated August 1, 2002, stating that Rush has a diagnosis

29

of fibromyalgia and that she has not been able to attend school for complete days.  (Tr. 201)

• A letter from a State of North Dakota rehabilitation counselor indicating that Rush has qualified for rehabilitation services.  (Tr. 202)

• An "end-of-year" school record dated May 21, 2002, that reflects the results of a meeting attended by Rush's mother, one of her instructors, the school principal, and a special-education case manager.  The record is signed by the case manager and evidences the fact that Rush was still working with school officials while at home to complete a GED.  The letter also indicates that the school officials were cognizant of Rush's condition.  In relevant part the letter states:

> Zeely's medical problems have grown worse since January 2002. She has been in great pain, very little sleep, and has a difficult time focusing on academic activities. . . . .  The team agreed to take a break over the summer with the hopes that Zeely's medical condition improves.  The team will convene late August to discuss Zeely's health condition and setting up a schedule to complete her GED.

(Tr. 203)

• The report of Dr. Brooks as already discussed. (Tr. 204-207)

• Several articles on fibromyalgia.  (Tr. 208-215)

The Appeals Council ordered that Rush's memorandum response and the other evidence be made a part of the record.  (Tr. 9).  The Appeals Council then denied the appeal on the basis that the information supplied did not provide a basis for changing the ALJ's decision because "the medical evidence you submitted does not indicate a new or worsening impairment not previously evaluated by the Administrative Law Judge in the decision that found you capable of a range of sedentary

work activity." (Tr. 6-7)  However, this clearly was not the point of Rush's appeal.  A fair reading

of her statement on appeal was that she was challenging the decision on the grounds of bias on the

part of the ALJ, failure to develop a proper record, abuse of discretion, errors of law, and the

decision not being supported by substantial evidence.  The Appeals Council did not address any of

these points.  (Tr. 6-8)

## II.    APPLICABLE LAW

### A.    Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo*

review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's

decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d at 993.

Substantial evidence is less than a preponderance, but more than a scintilla of evidence.

Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838

(8th Cir. 1992).   It  is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402

U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach

contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the

standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny

benefits without being subject to reversal on appeal." Id.   Consequently, the court is required to

affirm a Commissioner's decision that is supported by substantial evidence - even when the court

would weigh the evidence differently and reach an opposite conclusion.  Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner.  The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner.  Ellis v. Barnhart, 392 F.3d at 993.

### B.  Law governing eligibility for adult benefits

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act").  42 U.S.C. § 423(a)(1)(D).  To meet this burden to receive SSI benefits, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment.  42 U.S.C. § 423(d)(1)(A)."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the

32

claimant would be hired if he or she applied for work.  42 U.S.C. § 423(d)(2)(A).  Work available

in the national economy with respect to a particular person means "work which exists in significant

numbers either in the region where such individual lives or in several regions of the country."  Id.

In deciding whether a claimant is disabled within the meaning of the Act,  the ALJ is

required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional

capacity ("RFC"), which is what the claimant can do despite his or her limitations.  20 C.F.R. §

404.1545.  The ALJ is required to make the RFC determination based on all relevant evidence,

including, particularly, any observations of treating physicians and the claimant's own subjective

complaints and descriptions of his or her limitations.  Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's

credibility in light of the objective medical evidence and "any evidence relating to: a claimant's

daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication;

precipitating and aggravating factors, and functional restrictions."  Id.  In this circuit, these are

referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d

1320 (8th Cir. 1984).[2]  E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005).   Claimant's

subjective complaints may be discounted only if found to be inconsistent with the record taken as

a whole.  Pearsall v. Massanari, 274 F.3d at 1218.

     Also, the ALJ must give controlling weight to medical opinions of treating physicians that

are supported by accepted diagnostic techniques and that are not inconsistent with other substantial

evidence.  This rule does not apply, however, to opinions regarding disability or inability to work

because these determinations are within the exclusive province of the Commissioner.  The Eighth

Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating
> physician's medical opinions that are supported by the record. See Randolph v.
> Barnhart, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical
> source opinion that an applicant is "disabled" or "unable to work," however, involves
> an issue reserved for the Commissioner and therefore is not the type of "medical
> opinion" to which the Commissioner gives controlling weight. See Stormo [v.
> Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are

---

[2]  In Polaski, the Eighth Circuit stated the following with respect to the manner in which subjective pain complaints are to be analyzed:

> A claimant has the burden of proving that the disability results from a medically determinable physical
> or mental impairment . . . . While the claimant has the burden of proving that the disability results from
> a medically determinable physical or mental impairment, direct medical evidence of the cause and
> effect relationship between the impairment and the degree of claimant's subjective complaints need
> not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because
> the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective
> complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and
> complaints. The adjudicator must give full consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work record, and observations by third parties
> and treating and examining physicians relating to such matters as:
> > 1. the claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain;
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of medication; and
> > 5. functional restrictions.
> The adjudicator is not free to accept or reject the claimant's subjective complaints.

739 F.2d at 1321-22.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).

. . . .

The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996). And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d at 1217.

## III.    ANALYSIS AND DISCUSSION

### A.    Problems with the administrative record

In the "rationale" portion of his decision, the ALJ lists fourteen bullet-point items that he states suggest a pattern of non-compliance by Rush and her mother with treatment recommendations. At the very least, the ALJ relied upon these items to discount the credibility of Rush and her mother, particularly with regard to their claims that Rush is not capable physically of performing at the level of activity that would be required by the jobs the ALJ determined she was capable of performing.

35

Unfortunately, more than half of the ALJ's fourteen bullet-point items are based upon records that are not part of the administrative record before the court even though the ALJ clearly reviewed and relied upon them in making his decision. The absence of these records makes it impossible now to determine whether the ALJ fairly characterized the essence of the "omitted evidence" and gave it the weight it was due in the context of all the evidence.

Further, there are still other records, which appear to bear upon the correctness and fairness of several of the ALJ's bullet-point items, that are not in the current record before the court and that were not discussed by the ALJ. A number of these other records, however, are from the same time frame and, in some cases, from the same medical-care providers as the omitted records upon which the ALJ did rely and which also are not in the record. Consequently, some of these other records may have been reviewed by the ALJ, but simply not mentioned.

At this point, it appears virtually impossible to reconstruct what the ALJ reviewed and what he did not review. This is because the ALJ failed to identify at the hearing which exhibits were considered, because he refers to them only as the exhibits in the exhibit file. Further, the uncertainty as to the record before the ALJ gives rise to a similar concern as to what actually was submitted by the agency to the state DDS physician who prepared the Physical RFC Assessment, upon which the ALJ substantially relied and which was limited to a review of records. Obviously, a paper assessment made upon an incomplete set of relevant records would be entitled to no weight.

Moreover, these problems with the records are substantial and not something that can be ignored. To illustrate this point, a few examples are in order.

The first of the fourteen bullet-point items that the ALJ uses to discount the credibility of Rush and her mother is the ALJ's conclusion that physical therapy records from March 1999 showed

36

a decrease in pain with two visits. The fifth bullet-point item relates to a purported reference in later 1999 physical therapy records that Rush was tolerating the exercise and had more good days than she had in quite a while. As with a number of the other bullet-point items, the ALJ thought these two items were so significant that he bolded and underlined them in his decision. (Tr. 25)

However, none of the 1999 physical therapy records to which the ALJ refers are part of the record supplied to the court even though he obviously relied upon them. What is in the record with regard to physical therapy, however, is a "To Whom it May Concern" letter together with a handwritten note from one of the persons who administered Rush's physical therapy. These two documents were submitted by Rush and her mother to the Appeals Council following the ALJ's decision. In the handwritten note, the author states that the ALJ took certain references from the physical therapy records "out-of-context." The letter states that Rush was seen fourteen times between March 1999 and December 2001 for physical therapy and goes on to state:

> When I saw Zeely she seemed to initially respond to physical therapy but as we tried to advance her therapeutic exercises she would have so much pain that she was unable to do physical therapy sessions or do any sort of physical therapeutic exercise routine. This can be typical of people with fibromyalgia. Zeely did not respond to any of the pain-reducing modalities that we used.

The significance of this omitted, and possibly not considered, evidence is obvious: it not only substantially calls into question the specific inferences the ALJ attempts to draw with regard to non-compliance with physical therapy, but it also calls into question, more generally, the ALJ's overall conclusions of non-compliance, lack of effort, and his perception that Rush was physically capable of working.

Also, what is it that the ALJ actually reviewed in terms of the physical therapy records? Did he have before him only the 1999 physical therapy records to which he specifically refers and that

37

are not part of the court's record or did he also have before him, as well, the 2000 and 2001 records that he makes no explicit reference to? Further, what physical therapy records were supplied to the DDS contract physician for review? If any were supplied, was it only the 1999 physical records that the ALJ indicates show evidence of non-compliance? Or, did the records also include the 2000 and 2001 physical therapy records, which Rush claims not only confirmed her inability to follow through on the physical therapy despite her trying, but, more broadly, would also show that she was unable on any regular basis to engage in physical activity at the level demanded by the jobs the ALJ found she could perform? These are pertinent questions with respect to the contract physician's assessment not only with respect to Rush's physical capabilities, but also her credibility since the DDS physician made his own credibility judgments and discounted to a degree her complaints.

Another example of the record problems are two other related bullet-point items from the 1999 time frame: the recommendations by Dr. Riemers in April 1999 and by the unnamed physiatrist in June 1999 that Rush should engage in physical therapy, physical exercise, and a more active lifestyle, including returning to school. In his opinion, the ALJ states there was no evidence that Rush followed through with these recommendations.

However, again, the records of Dr. Riemers' and the unnamed physiatrist upon which the ALJ relies are not part of the record supplied to the court. And, with respect to these two bullet-points, there are concerns about whether the ALJ placed them in proper context in light of all the other evidence. As already noted, Rush did continue with physical therapy after the dates of the recommendations made by Riemers and the unnamed physiatrist and the evidence before the court now indicates she was unable to make significant progress because of her continuing chronic pain. Also, there is other evidence indicating that Rush did attempt to return to school in the fall of 1999

after these recommendations were made, but was unable to continue given her physical condition at that time.

Also, closely related to these points and from the same time period, is still another example of the problems with the record. This has to do with the fact that Dr. Riemers also referred Rush to Dr. David Brooks, a PhD clinical neuropsychologist, for a psychological and chronic pain-management assessment. It appears this was done in the summer of 1999 immediately after the referral to the unnamed physiatrist.

In his opinion, the ALJ makes reference to the referral to Dr. Brooks, but does not discuss the results as he did for the evaluation made by the unnamed physiatrist during the same time frame. (Tr. 204-207) It may be that the ALJ did not have Dr. Brooks' report and his knowledge of the referral could have come from Dr. Riemers' records.

Dr. Brooks' report, however, is now part of the record because it was supplied by Rush to the Appeals Council following the ALJ's decision. According to this report, Dr. Brooks saw Rush on June 24, 1999, at which time he administered a clinical interview, an MMPI test, and a pain assessment battery. Dr. Brooks concluded that: (1) Rush's pain and headaches fluctuated from very little on some days to "extremely high" on others; (2) Rush's complaints of pain and severe headaches (to the point of causing nausea at times) were credible in that Rush was "not magnifying her symptomatology" and that she "often experiences quite significant chronic pain;" and (3) Rush was not depressed and there were indications she was coping reasonably well under the circumstances [it appears he is referring to her psychological state], in spite of appearing to others as coping poorly. Dr. Brooks recommended (1) that Rush attempt to attend school on the days that she felt better or could tolerate the pain (but also concluded that it was not unreasonable that she not

39

attend or that she should come home when the pain was not tolerable); (2) that she attempt some physical conditioning under the supervision of a doctor to see how much she could tolerate; and (3) that she be referred to a neurologist for further exploration of the headaches and a physical medicine physician for addressing the pain management.

Dr. Brooks' conclusions that Rush was suffering from significant, fluctuating pain and that she was not magnifying her symptoms is certainly significant. And, at this point, it cannot be determined what impact Dr. Brooks' conclusions had in terms of Dr. Riemers' continuing evaluation of this matter because of the absence of Dr. Riemers' records. Even more significantly, it cannot be determined what impact Dr. Brooks' findings and conclusions would have had upon the credibility determinations made by the ALJ or the examining DDS physician if they would have considered the evidence. Since Dr. Brooks' report only appears in the administrative record as an exhibit received by the Appeals Council, it cannot be assumed it was reviewed by either the ALJ or the DDS physician.

Finally, without going through all of the ALJ's bullet-point items of alleged non-compliance for which there are no supporting records, the ALJ also stated that Dr. Riemers strongly encouraged Rush to go through a six-week inpatient pain treatment program and that Rush did not pursue this avenue. Again, what discussions may have been held between Dr. Riemers and Rush and her mother on this subject, either on the date indicated by the ALJ, or thereafter, cannot be determined because we do not have Dr. Riemers' records. However, in their joint statement to the Appeals Council, Rush and her mother answer this point by stating that there were two programs recommended by Dr. Riemers that Rush was not able to participate in, one because they did not have

the money and public assistance would not pay for it, and the other was because Rush was not eligible given her age.  They state that Dr. Riemers later confirmed both these facts.

At the very least, the problems with the administrative record require remand for a new ALJ hearing.  See Williams v. Barnhart, 289 F.3d 556, 557-558 (8th Cir. 2002) (suggesting remand is required when the absence of records hinders a fair review of the ALJ's decision); Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (remand required when reviewing court has no way to determine whether the Secretary fully understood the evidence before him); Callis v. Department of Health & Human Services, 877 F.2d 890 (8th Cir. 1989) (requiring remand when the incompleteness of the record prohibited the appeals court from making a meaningful review of the points raised on appeal).  Whether something more than remand for a new hearing is required is discussed below.

## B.    The ALJ failed to give appropriate consideration to Rush's obesity

On August 24, 1999, obesity was deleted from the Listing of Impairments in 20 C.F.R., subpart P, Appendix 1.  SSR 02-01p, 2000 WL 628049 at *1.  However, in deleting obesity as a listed impairment, the SSA did not intend that obesity should not be addressed in determining disability and subsequently issued a series of guidances on the subject, the most recent of which is SSR 02-01p, dated September 12, 2002.

SSR 02-01p acknowledges that obesity is a disease, the causes of which are not well understood.  It emphasizes that obesity is not always a mere function of overeating and failing to get enough exercise and that there may be intervening genetic and metabolic factors that are also significant. In relevant part it states the following:

41

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat. Obesity is generally the result of a combination of factors (e.g., genetic, environmental, and behavioral).

In one sense, the cause of obesity is simply that the energy (food) taken in exceeds the energy expended by the individual's body. However, the influences on intake, the influences on expenditure, the metabolic processes in between, and the overall genetic controls are complex and not well understood.

. . . .

Treatment for obesity is often unsuccessful. Even if treatment results in weight loss at first, weight lost is often regained, despite the efforts of the individual to maintain the loss.

SSR 02-01p states that obesity can lead to, or complicate, many other diseases and conditions, including, relevant to this case, chronic diseases involving the musculoskeletal body systems. It also states that the "effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea."

SSR 02-01p sets forth three levels of obesity: Level I includes a body mass index (BMI) of 30.0 - 34.9; Level II a BMI of 35.0 - 39.9; and Level III (also known as "extreme" obesity), includes BMI's greater than 40. As already noted, Rush is toward the higher end of the extremely obese category with a BMI in excess of 50.

Despite Rush being extremely obese, the ALJ never refers to SSR 02-01p in his opinion. And, while the simple failure to reference the guidance may not be error, it is clear in this case that he ignored its substance.

For example, the ALJ clearly discounted Rush's credibility when, in several of his bullet-point items, he suggests that Rush failed to comply with recommendations that she lose weight and get more exercise (which he also concluded could reasonably lead to a reduction in her chronic pain) without considering not only whether she tried, but also whether she likely would have been

42

successful. In so doing, he obviously did not take into account what SSR 02-01p has to say about the complexity of obesity as a disease, and its causes, as already noted. He also did not take into account what SSR 02-01p has to say about the significance that should attach to recommendations of weight loss and exercise and a claimant's failure to lose weight.

As to the latter point, SSR 02-01p provides specific guidance in terms of evaluating recommendations for more exercise and weight loss. While this guidance is offered in the section addressing what is required to find a person already classified as disabled not disabled, the principles in terms of medically and scientifically how much significance should attach to an inability to follow through on such recommendations are the same in this case. See also The Merck Manual, 58-62 (17th Ed.1999) This is particularly true here given Rush's extreme obesity, her acknowledged impairments, and the fact the ALJ used alleged non-compliance with recommendations regarding exercise and weight loss to discount evidence that otherwise would support a conclusion that Rush was not capable of doing the work the ALJ concluded she could perform - at least not on sustained basis.

Before turning to SSR 02-01p's guidance with respect to treatment recommendations specifically, it is helpful to first consider what the guidance has to say about treatment options and goals. In relevant part, SSR 02-01p states the following on this subject:

> Obesity is a disease that requires treatment, although in most people the effect of treatment is limited. However, if untreated, it tends to progress.

> A common misconception is that the goal of treatment is to reduce weight to a "normal" level. Actually, the goal of realistic medical treatment for obesity is only to reduce weight by a reasonable amount that will improve health and quality of life. People with extreme obesity, even with treatment, will generally continue to have obesity. Despite short-term progress, most treatments for obesity do not have a high success rate.

43

Recommended treatment for obesity depends upon the level of obesity. At levels I and II (BMI 30.0-39.9), treatment usually consists of behavior modification (diet and exercise) with the option of medication, usually either in the form of a fat-blocking drug or an appetite suppressant. Some people do not respond to medication, while others experience negative side effects. (In making our decision, we will also consider any side effects of medication the individual experiences.) Individuals with coexisting or related conditions may not be able to take medication because of its effects on their other conditions.

Generally, physicians recommend surgery when obesity has reached level III (BMI 40 or greater). However, surgery may also be an option at level II (BMI 35-39.9) if there is a serious coexisting or related condition. Obesity surgery modifies the stomach, the intestines, or both in order to reduce the amount of food that the individual can eat at one meal or the time food is available for digestion and absorption. Surgery is generally a last resort with individuals for whom other forms of treatment have failed. Some individuals also experience significant negative side effects from surgery (e.g., "dumping syndrome"--that is, rapid emptying of the stomach's contents marked by various signs and symptoms).

Because treatment options for obesity are limited and the success rate is problematic, SSR 02-01p provides the following guidance with respect to how failure to achieve weight loss should be evaluated after recommendations for exercise and/or weight loss have been given by treating physicians:

. . . . We will rarely use "failure to follow prescribed treatment" for obesity to deny or cease benefits.

SSR 82-59, "Titles II and XVI: Failure To Follow Prescribed Treatment," explains that we will find failure to follow prescribed treatment only when all of the following conditions exist:
• The individual has an impairment(s) that meets the definition of disability, including the duration requirement, and
• A treating source has prescribed treatment that is clearly expected to restore the ability to engage in substantial gainful activity, and
• The evidence shows that the individual has failed to follow prescribed treatment without a good reason.
If an individual who is disabled because of obesity (alone or in combination with another impairment(s)) does not have a treating source who has prescribed treatment for the obesity, there is no issue of failure to follow prescribed treatment.

44

The treatment must be prescribed by a treating source, as defined in our regulations at 20 CFR 404.1502 and 416.902, not simply recommended. *A treating source's statement that an individual "should" lose weight or has "been advised" to get more exercise is not prescribed treatment.*

*When a treating source has prescribed treatment for obesity, the treatment must clearly be expected to improve the impairment to the extent that the person will not be disabled.* As noted in question 13, the goals of treatment for obesity are generally modest, and treatment is often ineffective. *Therefore, we will not find failure to follow prescribed treatment unless there is clear evidence that treatment would be successful.* The obesity must be expected to improve to the point at which the individual would not meet our definition of disability, considering not only the obesity, but any other impairment(s).

Finally, even if we find that a treating source has prescribed treatment for obesity, that the treatment is clearly expected to restore the ability to engage in SGA, and that the individual is not following the prescribed treatment, we must still consider whether the individual has a good reason for doing so. . . . .

(emphasis added)

In this case, the ALJ failed to consider the recommendations for weight loss and more exercise within the guidance provided by SSR 02-01p, which, in large part, is a summary of the current thinking of the medical community with regard to obesity as a disease. The Merck Manual, 58-62 (17th Ed.1999)  Also, he did not set forth what he considered to be the "clear evidence" that treatment would be successful.  Instead, without engaging in any of this analysis (and also ignoring evidence of attempts at compliance, albeit unsuccessful), the ALJ discounted the credibility of Rush and her mother on account of Rush's alleged failure to follow through with the exercise and weight loss recommendations.  In so doing, the ALJ erred. See e.g., Stone v. Harris, 657 f.2d 210, 212 (8th Cir. 1981); Roberts v. Barnhart, 283 F.Supp.2d 1058, 1067 (S.D. Iowa 2003)[3]

---

[3]  In Stone v. Harris, the Eighth Circuit had this to say about the subject:

The district court wrote that, because Stone's obesity has not established physiological cause, her obesity was therefore "remedial" (sic, vide "remediable"). The agency is certainly not entitled to presumptions that obesity is remediable or that an individual's failure to lose weight is "wilful." The

Further, it is not clear from the ALJ's opinion whether he concluded Rush is presently capable of performing at the functional capacity he ultimately determined or whether he concluded she <u>would</u> be able to function at that level if she followed through (or if she had followed through) on the recommendations for exercise and weight loss that had been made. There is some language in the opinion that suggests the latter, and, if this also was ALJ's conclusion, this also was error without first considering the guidance of SSR 02-01p.

SSR 02-01p also instructs that a claimant's obesity must be considered at each step of the five-step process that is used to evaluate claims for disability. The next section will address the ALJ's failure to properly consider Rush's obesity, in combination with her other impairments, in making his RFC determination. What will be considered now is the failure to address Rush's obesity during step five.

Since Rush had no prior work experience, the burden at step five shifted to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. In reaching the conclusion that there were jobs Rush could perform, the ALJ relied upon the testimony of the vocational expert based solely upon his hypothetical questions that did not at any point explicitly ask the vocational expert what his responses would be, or whether any of his

---

notion that all fat people are self-indulgent souls who eat more than anyone ought appears to be no more than the baseless prejudice of the intolerant svelte. Modern studies debunk this myth. See S. Wooley, O. Wooley & Dyrenforth, *Theoretical, Practical, and Social Issues in Behavioral Treatments of Obesity*, 1 J. Applied Behavior Analysis 3, 5 (1979), and sources cited there.

The district court also saw the relation between Stone's obesity and her psychological problems as being one of simple causation, so that if Stone lost weight "many of her psychological problems would subside." There is little relevant evidence on this point in the record. What evidence there is suggests that the relation between Stone's overweight and her depression and "personality disorder" is a complex and reciprocal one. . . . . The proper question for the agency is not whether Stone's obesity is in some clinical sense remediable, but whether her obesity is the sole or major cause of her disabilities, and, if so, whether her obesity is reasonably remediable by her. The answers to these questions must, of course, be supported by substantial evidence.

responses would be different, for a person who is extremely obese - in this case in 350 pounds, or more, and BMI in excess of 50.

While it may not be necessary to ask the vocational expert about obesity every time it is claimed as an impairment because of the varying levels of obesity, see e.g., Forte v. Barnhart, 377 F.3d 892 (8th Cir. 2004), the issue should have been explored in this case given Rush's extreme obesity. And, while it may be that an extremely obese person could perform some or all of the jobs referenced by the vocational expert in this case (assuming no other impairments), we do not know the answer to this question because it was never asked. It may be that her obesity would have eliminated some of the jobs in the pool assumed to be available and raise the issue of whether there are significant numbers of jobs in the national and regional economy that could be performed.

**D.    The ALJ's determination of Rush's RFC is not supported by substantial evidence**

The ALJ concluded that Rush is capable of lifting five pounds frequently and ten pounds occasionally; sitting for up to six hours in an eight-hour shift with normal breaks; standing/walking up to 2 hours in a workday with normal breaks; and performing work that does not involve high levels of concentration. (Tr. 29) He also implicitly concluded, based upon the limitations imposed by the vocational expert that he accepted, that Rush is capable of doing this on a day-in and day-out basis, with an allowance of two absences per month.

The substantial medical evidence, however, is that Rush suffers from a combination of chronic pain likely caused by fibromyalgia, chronic fatigue, obesity, sleep disorder, an elevated sedimentation rate, and some psychological problems (which may be due, in part, to her physical condition and which may also go back to her history of having been sexually assaulted at a young age) even though there are some differences of opinion by her doctors as to the exact etiology of

47

each of these impairments and their relative individual severity. Further, considering the combination of these impairments, the substantial medical evidence is that Rush is currently not capable of performing at the functional capacity found by the ALJ - at least on a sustained basis.

As already noted, Rush completed her freshman year of high school, but with a substantial number of absences. In the fall of 1999, she started her sophomore year going mainly part-time, but soon stopped attending because she could not tolerate even that level of activity.

The ALJ, and the government in its brief to this court, point to a number of instances in which various doctors encouraged Rush to resume attending school as evidence that Rush is not disabled. However, encouragement in returning to school hardly amounts to a conclusion that a person is capable of working on a full-time, on a sustained basis, and in a competitive environment. Cf. Baker v. Apfel, 159 F.3d 1140 (8th Cir. 1998). This is true even for a person who is capable of attending school, more or less, full-time given the lesser-number of hours, more frequent breaks, and more tolerance for absences that everyone recognizes are typically involved in a school setting.

Moreover, in this case, the substantial evidence does not support a conclusion that Rush would be able to return to school full-time and that any return to school now would have to be less than full-time. For example, even back in the summer of 1999 before Rush's condition arguably worsened and she gained another fifty pounds or more, Dr. Brooks recommended that Rush attempted to attend school on the days that she felt better and could tolerate the pain, but concluded that it would not be unreasonable for her not to attend, or go home early, when the pain was not tolerable. (Tr. 204-207)

Later, Dr. McDonough, who subsequently became Rush's primary treating physician, encouraged Rush to return to school, but there is nothing in her contemporaneous records indicating

she could return to school on a full-time basis.  Subsequently, Dr. McDonough submitted a letter that is now part of the record stating that Rush was not able to attend school for complete days. (Tr. 201)

The conclusions of Dr. Brooks and Dr. McDonough are also supported by one or more of the evaluating physicians at the Mayo Clinic.  In a summary meeting toward the conclusion of Rush's several-day evaluation at Mayo, Dr. Starr stated the following:

> We discussed the difficulties for patients and their families in the context of chronic pain without a specific etiology.  We also discussed the most effective treatment plan; that patients should work on gentle reconditioning, formulating *a step-wise goal for returning to academics* including physical activity and good sleep hygiene. *Also explained that this is expected to take a prolonged period of time, as it has taken some time to have Zeely become debilitated.*

(Tr. 107; emphasis added)

Finally, Rush has been followed most recently for pain management by Dr. Martire, and there is nothing in Dr. Martire's records that suggests a belief she is capable of attending school full-time, much less working on an sustained basis.  In fact, he continually reports that Rush has continued problems with chronic pain and fatigue and has to rest a lot during the day.  (Tr. 133, 140, 141, 142, 144, 146, 147, 153-156)

The only medical evidence that may be contrary, and upon which the ALJ principally relied to support his RFC determination and the hypothetical questions he posed to the vocational expert, is the paper, checklist assessment made of Rush's RFC by the contract DDS physician.  As already discussed, this assessment was limited to a review of other physicians' records and did not include a patient examination nor was it based on any actual testing.

The Eighth Circuit, along with a number of other courts, have held that assessments made of residual functional capacity based upon a paper review of other records without an actual

49

examination are admissible, but not entitled to substantial weight in terms of an evaluation of disability, particularly in the face of other more credible evidence. E.g., Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997) (paper reviews without an actual examination are entitled to little weight); Gilliam v. Califano, 620 F.2d 691, 693 (8th Cir. 1980) (same); Landess v. Weinberger, 490 F.2d 1187, 1189-1190 (8th Cir. 1974) (same); see generally 3 Soc. Sec. Law & Prac. § 43.19. In this case, the paper determination of Rush's physical RFC is entitled to little weight, particularly given the contrary evidence of the treating and other evaluating physicians.

Further, this is assuming that the DDS physician who made the paper assessment had before him all of the relevant records. Since this cannot be determined, and given the fact that there are problems with the record that makes this a legitimate concern, this is another reason why the paper determination of Rush's physical RFC is entitled to little weight in this case.

Based on the foregoing, it is clear from the medical evidence alone that there is a lack of substantial evidence supporting the ALJ's RFC determination, as well as the hypothetical questions posed to the vocational expert based upon that determination. In fact, the substantial evidence is that Rush is not capable of performing the jobs the ALJ ultimately concluded she could perform.

Moreover, in addition to the medical evidence, there is also the other evidence submitted by Rush, her mother, and family friends that also supports the conclusion that Rush is not capable of performing at the level assumed by the ALJ in his hypothetical questions - at least on a sustained basis. In this case, the ALJ clearly discounted the credibility of this evidence. But, the reasons that he expresses for doing so are largely not supported by substantial evidence, particularly in light of the rebuttal made by Rush and her mother that is more persuasive and that, for the most part, is supported by the substantial evidence.

50

After careful review of the record, many of the ALJ's fourteen bullet-point items were based on nothing more than speculation or his own unsupported medical judgment. Examples of these are the bullet- point items claiming non-compliance with recommendations regarding weight loss and more physical activity. The problem of assuming lack of credibility based upon lack of compliance has already been discussed in the last section.

And, with respect to most of the other bullet-point items, it is clear the ALJ either did not have all of the facts or the facts he relied upon were taken out-of-context, particularly with regard to later records and events. Examples are: (1) the early 1999 recommendations for physical therapy and return to school when, in fact, both were later attempted; (2) the claimed reluctance to follow through on certain referrals by Dr. McDonough for which there were legitimate explanations (lack of resources for one and ineligibility for the other) for why these particular referrals were not complied with and with respect to which the ALJ did not bother to ask Rush and her mother about, Brown v. Sullivan, 902 F.2d 1292, 1295 (8th Cir. 1990) (lack of resources is legitimate grounds for not complying with a treatment recommendation); (3) the reliance upon an isolated reference to caffeine consumption and alleged non-compliance with sleep techniques without placing these references in the context of all of the evidence and again without asking Rush and her mother what efforts were in fact made; (4) the issue with regard to the drug "Stadol" and the ALJ's apparent failure to recognize this as an addicting drug and to place the claimant's response regarding the efficacy of pain medications in its proper context - particularly when the record indicates that Rush and her mother several times asked that narcotic medication be prescribed but that Rush's physicians were unwilling to do so on a routine basis; and (5) the emphasis on the lack of treatment records for Dr. Martire after September 2002 when, in fact, Rush continued to see Dr. Martire on a periodic

51

basis through January of the next year and this could have been easily determined by the ALJ if he had simply asked Rush about the lack of records after September 2002.

Also, in making his credibility determinations, the ALJ placed undue weight upon records and events in the spring and summer of 1999 without considering the credible evidence that Rush's chronic pain and fatigue worsened after that time and the fact that she also continued to gain significant additional weight. Consequently, for all of these reasons, the ALJ's credibility determinations are not supported by substantial evidence and are not sufficient to discount the testimony and other evidence regarding Rush's impairments and the impact that they have on her daily life. See Cline v. Sullivan, 939 F.2d 560 (8th Cir. 1991).

Finally, a few observations about several of the points raised in the government's brief with regard to the ALJ's RFC determination and the credibility of Rush and her mother are in order. The government argues that the ALJ's decision that Rush is not as impaired to the extent that she and mother claims is supported by the lack of objective medical evidence of an impairment or resultant limitations. The government then chronicles a long list of tests and observations that in multiple examinations have been found to be normal, such as the thoracic and lumber spine x-rays, bone scans, reflexes, no observed swelling of joints, etc.

However, in emphasizing the lack of objective medical evidence, the government fails to consider the nature of the disease. As noted, the substantial weight of the medical evidence is that Rush's chronic pain is most likely the result of fibromyalgia, "which is pain in the fibrous connective tissue components of muscles, tendons, and ligaments, and other white connective tissues, which can be disabling." Kelly v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). In fact, this diagnosis was accepted by the reviewing DDS physician.

The very nature of fibromyalgia, and what makes it so elusive, is the lack of objective tests that can conclusively confirm its existence. E.g., Willoughby v. Commissioner of Social Security, 332 F.Supp.2d 542, 546 (W.D.N.Y. 2004); see Kelly v. Callahan, supra; The Merck Manual, 481-482 (17th Ed.1999). And, in this case, none of the negative findings chronicled by the government are inconsistent with the diagnosis of fibromyalgia. See The Merck Manual, 481-482 (17th Ed.1999). In fact, despite these negative findings, the consistent diagnosis of most of Rush's treating and evaluating physicians has been that of chronic pain most likely related to fibromyalgia - a diagnosis, which, by the way, was also accepted by the DDS reviewing physician.

Further, there is some objective medical evidence for the diagnosis of fibromyalgia, as well as for other complicating impairments. For example, at least four different physicians (Dr. McDonough, Dr. Martire, Dr. Pedersen, and Dr. Thomas) have documented the existence of multiple trigger points or points of pain, which is an objective finding consistent with the nature of the fibromyalgia. (Tr. 111, 117, 128-129, 130, 132, 155) See The Merck Manual, 481-482 (17th Ed.1999). Also, Rush's obesity has been objectively observed and repeatedly measured. Likewise, there is objective confirmation of Rush's chronic fatigue (aside from the testimony of her mother) by way of the visual observations by a family friend who is an RN (Tr. 82-85) and apparently also by local school officials (Tr. 203).

Further, there is no dispute about the fact that repeated testing has indicated that Rush has a fluctuating, but consistently higher than normal, sedimentation rate. Almost all of the doctors have indicated this of concern and have included it in their diagnoses although they do not have a good explanation for why its is elevated or how exactly how it may impact her condition. For example, Dr. Thomas at the Mayo Clinic stated that it could be evidence of some kind of occult infection or

that it might be related to her obesity. (Tr. 112) Dr. Martire opined that it could be indicative of a muscle disorder that may not manifest itself until some time in the future. (Tr. 155)

The government also claims in its brief that Rush has not proved, and has not even claimed, any functional impairments related to her obesity. This also is not true. Rush has clearly claimed her obesity as one of her impairments. Further, even the ALJ and the reviewing DDS physician concluded that Rush' diminished physical capabilities are aggravated by her obesity. Also, there is substantial evidence that Rush has a sleep disorder that contributes to her fatigue and, at this point, the doctors have not ruled out sleep apnea, or some other disorder associated with her weight, as being the cause of her sleep problems (Tr. 125-126) although sleep problems are also a recognized symptom of fibromyalgia. Kelly v. Callahan, 133 F.3d at 589 (fibromyalgia "often leads to a distinct sleep derangement which often contributes to a general cycle of daytime fatigue and pain."); see also The Merck Manual, 481-482 (17th Ed.1999). Finally, to claim that a person who is at the high end of the highest category of obesity is not in any way functionally impaired defies common-sense.

The government further argues that recommendations by one or more of Rush's doctors that she return to school and the evidence that she can cook, clean her room, ride the bus, etc. are also substantial evidence supporting the ALJ's conclusion that she is not disabled. However, as already discussed, the government does not explain how an ability to go to school translates into the ability to do the work of the type that the ALJ has concluded she can perform on a sustained basis. Morever, the substantial evidence is that Rush, at best, would only be capable of returning to school part-time. Likewise, the fact that Rush can watch TV, perform some household work, and engage in other like daily living activities ("ADL's" in the parlance of the reviewing DDS physician) is not substantial evidence of being able to work full-time in a competitive environment and does not prove

the lack of a disability. E.g., Draper v. Barnhart, 425 F.3d 1127, 1131(8th Cir. 2005). In other words, an applicant need not be totally bedridden to be disabled within the meaning of the law. Ledden v. Bowen, 888 F.2d 1246 (8th Cir. 1989).

The government also discusses at some length that the ALJ was justified in discounting the credibility of Rush and her mother regarding the severity of Rush's chronic pain and fatigue and the impact that the combinations of these conditions have on her daily life. The lack of substantial evidence supporting the ALJ's determination has already been addressed as have most of the points raised by the government's brief on this subject. However, two of the arguments made by the government are particularly unpersuasive and merit separate attention.

One is that "[pl]laintiff did not take significant medication specifically for pain regularly, indeed, at times relying on only nonprescription medication." What the government neglects to mention, however, is that Rush's treating physicians tried many different drugs to address Rush's complaints of chronic pain, but were found either not to have worked or that Rush was not able to tolerate them. (Tr. 130, 154, 185, 194-195) Further, the government also fails to mention that, more than once, Rush and her mother requested that the doctors consider prescribing pain medications containing narcotics, but that her physicians were reluctant to do so because of her age and not wanting to risk her becoming addicted. (Tr. 107, 129, 130) Contrary to the claim of the government, the drug evidence supports Rush's credibility in terms of her complaints of pain. So also is the evidence of the attempts made by Rush and her mother to obtain second opinions, including an evaluation at the Mayo Clinic.

A second particularly unpersuasive point is the government's reliance upon a statement by Rush at the hearing that she has taken "hundreds" of medications for her pain. The government

claims this is not supported by the record, *i.e.*, that she has not literally tried "hundreds" of pain medications. The government points to this as evidence that Rush is prone to making false and exaggerated responses.

However, as already noted, many medications have been prescribed for Rush's pain and sleep problems and that, almost without exception, the drugs have either been found not to have been effective (trials of certain narcotic medications being perhaps the exception) or she has reacted to them. In fact, Rush has ended up in the emergency room because of drug reactions and one time had to be transported by ambulance from Hazen to Bismarck. (Tr. 194-195, 237-238) Further, for almost the better part of 2002, Rush repeatedly took the bus back and forth between Hazen and Bismarck while Dr. Martire tried a number of different drugs to address her chronic pain. (Tr. 133-156, 238) Under the circumstances, the use of the word "hundreds" by this young girl appears to have been nothing more than a bit of hyperbole, *i.e.*, an expression that many drugs had been tried, and, perhaps also some frustration.

### E. Other points raised by the parties

#### 1. ALJ's failure to develop a full and fair record

Rush argues in her brief that the ALJ failed in his obligation to develop a fair and full record. In that regard, it does appear that the ALJ could have resolved a number a number of his concerns about Rush's compliance with treatment recommendations if he had simply asked Rush or her mother about them, rather than merely surmising non-compliance. See Cline v. Sullivan, 939 F.2d at 569.

#### 2. Violation of right to counsel

Rush also argues that her right to counsel was violated.  While it is true that a claimant has a right to counsel at a disability hearing, the right can by waived.  42 U.S.C.A. § 406; C.F.R. § 404.1700; <u>Thompson v. Sullivan</u>, 933 F.2d 581, 584 (7th Cir. 1991).  Consequently, if the record contains substantial evidence showing that a claimant knowingly and willingly waived his or her right to legal counsel, there is no error in proceeding at a disability hearing without counsel.  <u>Kraft v. Sullivan</u>, 1993 WL 151375, * 2 (D.N.D. Feb. 24, 1993) (citing <u>Phelan v. Bowen</u>, 846 F.2d 478, 481 (8th Cir. 1988).  In this case, the record supports the conclusion that Rush knowingly and voluntarily waived her right to counsel.  Hence, there was no error on the part of the ALJ with respect to this point.

### 3.    Childhood disability benefits

The exclusive focus so  far has been upon Rush's claim for adult SSI benefits.  However, also at issue is her claim for childhood disability benefits ("CDB").  At the time of the filing of the subject application, Rush was 38 days from turning 18 years old at which time she was eligible for adult SSI disability benefits assuming she would otherwise qualify.

The sequential criteria used by the SSA for determining disability for CDB benefits is different than adult disability.  <u>Compare</u> <u>with</u> 20 C.F.R. §§ 416.924(a) and 416.924a (childhood criteria) <u>with</u> 20 C.F.R. § 416.1520 (adult criteria); <u>see</u> <u>Jones v. Barnhart</u>, 335 F.3d 697 (8th Cir. 2003) (discussing the differences).  In this case, the ALJ disposed of the CDB claim in a single sentence by adopting the medical conclusions of the State Agency reviewers and stating Rush did not qualify based on this evidence.  At no point does the ALJ explain his denial of CDB benefits within the context of the sequential criteria required for a CDB determination.

Recognizing this failure, the government argues that the court can, instead, rely upon the ALJ's determination using the adult sequential criteria because of the fact that Rush was almost 18 at the time she filed her application. However, the only authority cited by the government for this proposition is 20 C.F.R. § 416.963(b), which the government claims allows the Commissioner some latitude in applying age categories in borderline situations.

The government's reliance upon 20 C.F.R. § 416.963(b), however, is misplaced because this section addresses the use of age categories in an entirely different context. Rather, the controlling section is 20 C.F.R. §§ 416.924(f), which specifically addresses what must be done in the situation in which an applicant files before the age of 18 and the decision with regard to benefits is made after the age of 18, which is that the childhood criteria will be used for the period the person is under the age of 18. Cf. Jones v. Barnhart, supra (applying CDB criteria for an applicant who filed a little more than month prior to her 18th birthday).

In addition to not explaining his decision using the CDB sequential criteria, the ALJ's decision denying CDB benefits also suffers from many of the same deficiencies already noted with respect to his determination regarding adult benefits, i.e., problems with the record evidence, failure to properly take into account Rush's obesity, failure to give appropriate weight to the opinions of Rush's treating and evaluating physicians, and failure to give appropriate weight to the testimony of Rush, her mother, and the other non-medical evidence. Consequently, remand for a rehearing with regard to the CDB benefits is required.

### F. Claimant is entitled to an award of adult benefits

When error has been committed, remand to the agency for further determination is ordinarily the remedy. However, when the total record convincingly establishes disability and is transparently

58

one-sided against the Commissioner's decision, a remand for an award and computation of benefits is warranted. E.g., Roberts v. Barnhart, 283 F.3d at 1067-68; Kelly v. Callahan, 133 F.3d at 590; Cline v. Sullivan, 939 F.2d at 569.

In this case, the ALJ concluded that Rush was severely impaired and his RFC determination essentially eliminated Rush from being able to perform all but unskilled, sedentary work. The vocational expert further testified that these jobs pretty much require full-time attendance, eight hours a day, five days a week, with limited breaks and with an absence tolerance of two days per month for sickness, doctor's appointments, and other medical reasons.[4] Further, the clear import of the vocational expert's testimony was that person who could not meet these minimum requirements would not be employable in a competitive market.

Contrary to the conclusion reached by the ALJ, the record evidence taken as a whole, after giving due weight to Rush's treating physicians and the other evidence presented by the claimant, is that Rush is not physically capable of meeting the job requirements outlined by the vocational expert on a sustained basis. Rather, the record overwhelming supports the conclusion that there would be a number of days that Rush would not be able to work full-time and that she would average more than two absences per month, even working on a part-time basis. This being the case, and the opinion of the vocational expert having eliminated all other job possibilities, an award of adult benefits is warranted. See Holstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001) (remand for award of benefits when, after proper characterization of claimant's disabilities, the testimony of

---

[4] While the evidence of an average of two days per month is accepted for purposes of this decision, this amounts to essentially a month of absences per year. The undersigned would be interested in seeing the support for this part of the vocational expert's opinion, particularly for the types of jobs that Rush was found qualified to perform. The undersigned questions whether many employers would tolerate this level of absences on a sustained basis.

the vocational expert indicated there were no jobs in the national or regional economy that claimant could perform); <u>Taylor v. Chater</u>, 118 F.3d at 1279 (same).

Further, an award of benefits is not inconsistent with the conclusion that remand would be required if the record did not convincingly establish an award of benefits in Rush's favor because of problems with the record. This is because the problems with the record relate primarily to older medical records relied upon by the ALJ that are of questionable relevance given the evidence that Rush's condition later worsened and the fact that the more recent records alone support an award of benefits for the reasons already explained.

Also, to the extent that the ALJ may have concluded that Rush would be able to work on a sustained basis at the level he determined <u>if</u> she lost weight and that she should be held accountable for any failure to do so, there simply is not sufficient evidence to support such a conclusion, much less the "clear evidence" required by SSR 02-01p before holding a claimant accountable for failing to lose weight. In fact, the credible evidence is that Rush's chronic pain preceded her significant weight gain and it is mere speculation that significant weight loss, even if it could be achieved, would eliminate the chronic pain that likely is caused by fibromyalgia. Under these circumstances, denial of benefits based on a failure to lose weight is not warranted. <u>See</u> <u>Brown v. Sullivan</u>, 902 F.2d at 1296 (claimant not penalized for failing to lose weight); <u>cf.</u> <u>Kelly v. Callahan</u>, 133 F.3d at 589-590 (claimant not be penalized for failing to quit smoking after being advised to quit).

Having reached the conclusion that there is sufficient certainty in the evidence to support an award of adult SSI benefits, the same certainty of conclusion cannot be reached, however, with respect to the claim for CDB benefits because of the different criteria that apply. Nevertheless, as

a practical matter, the Commissioner should consider awarding these benefits, as well, particularly after arguing that the adult criteria could be used in this case and that, when such criteria are used, the total record evidence clearly supports an award of benefits.

Finally, an award of adult benefits does not mean that Rush will remain entitled to benefits forever.  The nature of fibromyalgia is that there might very well be improvements in her condition over time.  See The Merck Manual, 481-482 (17th Ed.1999)  It is also possible there may be changes with respect to her other impairments.  For example, surgery may be an option for Rush's obesity at some point.  See SSR 02-01p.

Under the social security laws, the Commissioner is entitled to periodically review and reassess any finding of disability; also, it remains the obligation of the claimant to do what she can to get herself off disability.  See e.g. 20 C.F.R. §§ 416.989 - 416.994.

## IV.    CONCLUSION AND RECOMMENDATION

Based on the foregoing, it is hereby **RECOMMENDED** that:

1.    Plaintiff's motion for summary judgment (Docket No. 8) be granted in part and defendant's motion for summary judgment (Docket No. 12) be denied.

2.    The case be remanded to the Commissioner for an award of adult SSI Benefits in an appropriate amount beginning from when she would first become eligible for such benefits.

3.    The case be remanded to the Commissioner for a determination of whether or not CDB benefits should be awarded afer applying the sequential evaluation criteria for Childhood Disability Benefits or for an award of benefits in an appropriate amount.

## NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to Local Rule 72.1(3)(4), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation.

Dated this 10th day of February, 2006.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge